## IN THE UNITED STATED DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ARTHUR M. LOVE<br>2064 Lake Grove Lane<br>Crofton, Maryland 21114<br><br>       *Plaintiff,*<br><br>v.<br><br>LARRY HOGAN<br>100 State Circle<br>Annapolis, MD 21401<br><br>BOYD RUTHERFORD<br>100 State Circle<br>Annapolis, MD 21401<br><br>STEVEN MCADAMS<br>100 State Circle<br>Annapolis, MD 21401<br><br>ALLISON MAYER<br>100 State Circle<br>Annapolis, MD 21401<br><br>MONA VAIDYA<br>100 State Circle<br>Annapolis, MD 21401<br><br>SHAREESE CHURCHILL<br>100 State Circle<br>Annapolis, MD 21401<br><br>MATHEW A. CLARK<br>100 State Circle<br>Annapolis, MD 21401<br><br>THE STATE OF MARYLAND<br>Serve: Brian Frosh, Attorney General<br>200 St. Paul Place, 20th Floor<br>Baltimore, MD 21202<br><br>       *Defendants.* | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Arthur M. Love IV, by and through his attorneys, does hereby sue Defendants Steven McAdams, Allison Mayer, Larry Hogan, Mana Vaidya, and the State of Maryland (collectively, Defendants) pursuant to 42 U.S.C. §§ 1983, 1985, 1986, 1988, and Article 40 of the Maryland Declaration of Rights, for violations of his rights guaranteed by the First and Fourteenth Amendments to the United States Constitution and by Article 40 of the Maryland Declaration of Rights. In support of his causes of action, Plaintiff alleges as follows:

## PARTIES

1.      Plaintiff Arthur M. Love IV is a citizen of the United States residing in Anne Arundel County, Maryland.

2.      Defendant Larry Hogan was at all times relevant the Governor of the State of Maryland. Hogan's public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, Hogan is sued in both his individual and official capacities.

3.      Defendant Boyd Rutherford was at all times relevant the elected lieutenant governor for the State of Maryland. Rutherford's public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, Rutherford is sued in both his individual and official capacities.

4.      Defendant Steven McAdams was at all times relevant the Executive Director of the Governor's Office of the State of Maryland. McAdams' public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, McAdams is sued in both his individual and official capacities.

5.      Defendant Allison Mayer was at all times relevant the Deputy Chief of Staff for the Governor's Office of the State of Maryland. Mayer's public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, Mayer is sued in both her individual and official capacities.

6.      Defendant Mona Vaidya was at all times relevant the Director of Financial Administration for the Governor's Office of the State of Maryland. Vaidya's public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, Vaidya is sued in both her individual and official capacities.

7.      Defendant Shareese Churchill was at all times relevant the Press Secretary for the Governor's Office of the State of Maryland. Churchill's public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, Churchill is sued in both her individual and official capacities.

8.      Defendant Mathew A. Clark was at all times relevant the Chief Staff for the Governor's Office of the State of Maryland. Clark's public office is maintained at 100 State Circle, Annapolis, Maryland. Regarding Mr. Love's federal constitutional claims alleged herein, Clark is sued in both his individual and official capacities.

9.      Defendant State of Maryland is a body corporate and politic, having all the rights and powers of government under the Maryland Constitution and laws of the state of Maryland.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983, 1985, and 1986.

11.      This Court has supplemental jurisdiction over Plaintiff's state constitutional claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court has supplemental jurisdiction over Plaintiff's claims for wrongful termination pursuant to 28 U.S.C § 1367(a).

13.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because multiple Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

14.     Arthur M. Love IV has been a faithful public servant to the State of Maryland for many years.

15.     Mr. Love led Governor Hogan's statewide field operations during Hogan's first gubernatorial campaign.

16.     On January 21, 2015, Governor Hogan appointed Mr. Love Deputy Director of Community Initiatives.

17.     In his role as Deputy Director of Community Initiatives, Mr. Love has organized numerous charitable events for the citizens of Maryland and earned a reputation as an exemplary and dedicated public servant.

18.     Mr. Love was unlawfully terminated from his Deputy Directorship on or about August 30, 2020.

19.     The State and its agents asserted that Mr. Love's termination was based upon off-duty social media posts made in a private online chat room.

20.     The social media posts in question were in a private Facebook group called "Inside Maryland Politics" and commented on the civil unrest occurring in Kenosha following the police shooting of Jacob Blake on August 23, 2020, which was a matter of great public concern and the subject of a national debate.

21.     When protests in Kenosha turned violent the eyes of the nation fixed upon the city, as the country once again found itself immersed in a difficult political conversation about race, policing, protests, and the rights of all Americans.

22.     Kyle Rittenhouse then became involved in this national narrative of public concern when he was involved in a controversial shooting during one of the Kenosha protests.

23.     This event sparked further national dialogue on a range of issues of public concern such as race, policing, protests, the use of self-defense, Second Amendment Rights, and American culture.

24.     Mr. Love participated in this national dialogue on these matters of public concern in his capacity as a private citizen, while acting far outside the scope of—and off duty from—his government position, using his private social media account and his personal electronic device.

25.     Specifically, on August 28, 2020, Mr. Love used his *private* Facebook account to discuss Mr. Rittenhouse's case and support Mr. Rittenhouse's self-defense right, communicating his personal belief that Mr. Rittenhouse's actions may have been justified under the doctrine of self-defense. Mr. Love did so in his personal time, while lying on his bed in his home, using his *private* personal Facebook account. Mr. Love neither expressly nor implicitly purported to make such statements in an official capacity as a Maryland government employee.

26.     Other members of the *private* group hosting this social media discussion became aggrieved with Mr. Love's position, prompting Mr. Love to exit the conversation.

27.     The next morning (August 29), Mr. Love awoke to the press at his home. He proceeded to call Defendant McAdams.

28.     McAdams informed Mr. Love that he need not worry and that they would "get through this."

29.     Instead, upon information and belief, on either August 28 or 29, one or more of the Defendants decided to, and did, terminate Mr. Love's employment because of his comments about Rittenhouse's right to self-defense.

30.     Mr. Love first learned he had been terminated from a television news report aired on August 29.

31.     On August 30 at or about 8:38 am, Mr. Love received a phone call from McAdams informing Mr. Love that he had been terminated due to his Facebook posts on Mr. Rittenhouse's potential justification under the doctrine of self-defense.

32.     On August 31, Mr. Love received his official termination letter via email from McAdams.

33.     McAdams or his representatives publicly stated that Mr. Love's termination was due to his private social media posts. Specifically, McAdams stated: "These divisive images and statements are inconsistent with the mission and core values of the Office of Community Initiatives. Earlier today, I relieved this employee of his duties."

34.     The termination predicated on these posts was content-based or viewpoint-based discrimination against the political viewpoints Mr. Love expressed as a *private* citizen on a matter of *public concern*, on his *private* social media account, using his *private* device, in his *personal* time, without purporting to speak in an official capacity as a Maryland government employee.

35.     Defendants collectively conspired to—and succeeded in—unlawfully terminating Mr. Love's public employment in violation of his civil rights.

## LEGAL FRAMEWORK

### A.  Federal Claims

36.     The First Amendment to the United States Constitution guarantees Mr. Love's

fundamental right to free speech. USCS Const. Amend. I.

37.     At the heart of the First Amendment is the recognition of the fundamental importance of

the free flow of ideas and opinions on matters of public interest and concern. Time and again, the

United States Supreme Court has emphasized that "[t]he freedom to speak one's mind is not only

an aspect of individual liberty—and thus a good unto itself—but also is essential to the common

quest for truth and the vitality of society as a whole." *Hustler Magazine, Inc. v. Falwell*, 485 U.S.

46, 50–51 (1988). The freedom to speak one's mind on matters of public concern—as Mr. Love

did here—"has always rested on the highest rung of the hierarchy of First Amendment values."

*Carey v. Brown*, 447 U.S. 455, 466–67 (1980).

38.     The Court has been clear as to the internet's central role in modern public debates:

"While in the past there may have been difficulty in identifying the most important places (in a

spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast

democratic forums of the Internet' in general, [citation], and social media in particular."

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

39.     Social media platforms that facilitate the free exchange of ideas, such as Facebook, are

modern-day equivalents to streets or a park, and are subject to traditional public forum analysis

for First Amendment purposes. *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019).

40.     Official censorship based on a government actor's subjective judgment that the content of

protected speech is offensive or inappropriate is unconstitutional "viewpoint discrimination."

*Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). Viewpoint discrimination is an egregious form of

content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983). In other words, discrimination against speech because of its message is presumed to be unconstitutional.

41.     Viewpoint discrimination is prohibited in all forums and "is apparent, for example, where a government official's decision to take a challenged action was 'impermissibly motivated by a desire to suppress a particular point of view.'" *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).

42.     The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution commands that similarly situated persons be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When, as in this case, an equal protection violation arises from a First Amendment violation, the two claims are "fused" together. *Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) (citing *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 384–85 n.4 (1992)).

43.     Federal statutory law permits Mr. Love to bring a private cause of action to redress violations of his rights guaranteed by the Bill of Rights in the United States Constitution. Specifically, 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

44. Federal law also extends civil liability to those who conspire to violate constitutionally protected rights, *id.* § 1985, and to those with knowledge of such a conspiracy and the power to prevent or aid in preventing the wrongs conspired to be done, yet fail to do so, *id.* § 1986.

45. Congress has also provided that in an action such as this one, the court may allow the plaintiff to recover attorney fees. *Id.* § 1988(b). The Court may also include expert witness fees when awarding attorney's fees. *Id.* § 1988(c).

46. As used in sections 1983, 1985, and 1986, the term "person" includes all individual Defendants in this action. Defendant State of Maryland is also a "person" within the meaning of these statutes. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1977).

### B. State Claims

47. In addition to the federal legal framework discussed above, Article 40 of the Maryland Declaration of Rights provides state constitutional protections coextensive with the First Amendment of the United States Constitution. *DiPino v. Davis*, 354 Md. 18, 43 (1999) (citing *Jakanna v. Montgomery Cty.*, 344 Md. 584 (1997)).

48. Although the rights protected by Article 40 of the Maryland Declaration of Rights are coextensive with the rights protected under the First Amendment of the United States Constitution, the legal analysis of State Constitutional torts differs substantially from the legal analysis applicable to claims asserted under 42 U.S.C. §§ 1983, 1985, and/or 1986.

49. First, unlike federal claims brought under Title 42, and unlike some common law torts, "neither the local government official nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution." *DiPino*, 354 Md. at 51; *Ritchie v. Donnelly*, 324 Md. 344, 373–74 (1991).

50.     Second, the "personal/official capacity distinction applied in § 1983 actions" does not apply when considering State Constitutional claims. *DiPino*, 354 Md. at 51. The Maryland Court of Appeals has explained:

> This Court has consistently held that a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages. . . . This liability for damages resulting from unconstitutional acts is in no way based upon the 'official/individual capacity' body of law which has developed in federal § 1983claims. Liability has been imposed upon the government official when his unconstitutional actions were in accordance with or dictated by governmental policy or custom. Liability has also been imposed when the unconstitutional acts were inconsistent with governmental policy or custom. Moreover, contrary to the view of the circuit court in the present case, liability has been imposed upon the official when he was acting in the scope of his employment.

*Ritchie*, 324 Md. at 370–71 (internal citations omitted).

51.     Finally, "[a] third difference hinges on the existence of respondeat superior liability on the part of local governmental entities for State Constitutional violations. There is no such vicarious liability under § 1983, because of the distinction drawn between personal and official capacity actions." *DiPino*, 354 Md. at 51. The Court of Appeals went on to say: "We shall now dispel any doubt in the matter and make clear, as a matter of common law, that local governmental entities do, indeed, have respondeat superior liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *Id.*

52.     The Maryland Tort Claims Act provides: "[T]he immunity of the State and of its units is waived as to a tort action" rendering the state liable for the actions in this case. MD. CODE ANN., STATE GOV'T § 12-104 (2015).

53.     The State government's liability is limited under the Maryland Tort Claims Act to a maximum of $400,000 to a single claimant for injuries arising from the same incident or occurrence. *Id.* § 12-104(2) (2015).

54.     A local government entity "shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." MD. CODE ANN., CTS.& JUD. PROC. § 5-303(b).

55.     With respect to Plaintiff's federal and state claims alleged below, all individual Defendants are sued in both their personal and official capacities, and the state government Defendant is not separately named. A claim against a public official in his or her official capacity is equivalent to a claim against the municipality itself. *Davison v. Randall,* 912 F.3d 666, 688 (4th Cir. 2019) (additional citations omitted); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))).

### C.  Maryland and Federal Public Policy

56.     Maryland law provides a cause of action for wrongful discharge when an at-will employee's termination "contravenes some clear mandate of public policy." *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 150 (4th Cir. 2002) (quoting *Adler v. Am. Standard Corp.*, 432 A.2d 464, 473 (Md. 1981)).

57.     The Maryland State Constitution provides one of the clearest articulations of public policy available when it comes to freedom of speech.

58.     As previously discussed, Article 40 of the Maryland Declaration of Rights provides State Constitutional protections coextensive with the First Amendment of the United States Constitution. *DiPino*, 354 Md. 18, 43 (1999) (citing *Jakanna*, 344 Md. 584 (1997)).

59.     Viewpoint and political discrimination are prohibited in all forums, creating a public policy against government action that is 'impermissibly motivated by a desire to suppress a particular point of view.'" *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).

60.     Maryland courts have stressed that in order for a mandate of public policy to be well-established enough to form the basis of a wrongful discharge action, there "must be a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation." *Szaller*, 293 F.3d at 151.

61.     This standard is met by Article 40 of the Maryland Declaration of Rights as well as the First Amendment of the United States.

62.     The social media posts at issue in this case were not posted on any of the official sources regulated by the Office of the Governor Social-Media Policy.

## COUNT I

### Retaliation Based on Exercise of the Right to Free Speech in Violation of 42 U.S.C. § 1983 (All Defendants)

63.     Plaintiff incorporates paragraphs 1 to 62 as if fully set forth herein.

64.     Defendants managed, had authority over, and or were materially involved in the decision to terminate Mr. Love.

65.     On or about August 28, 2020, Mr. Love posted several comments in support of Mr. Rittenhouse's right to self-defense in a private Facebook discussion, using his private device, in his private time, outside the scope of his official duties as a state employee.

66.    Mr. Love's Facebook posts at issue constitute constitutionally-protected activity commenting as a private citizen on matters of public concern, on his personal social media account.

67.    As a result of Mr. Love's constitutionally protected activity, Mr. Love was subjected to adverse action by Defendants that would chill an ordinary person from continuing to engage in that protected activity.

68.    There was a substantial causal relationship between the constitutionally-protected activity and the adverse action taken by Defendants against Mr. Love.

69.    As a direct result of Mr. Love exercising his constitutional right to speak publicly, in his own time, as a private citizen, on a matter of public concern, Defendants retaliated against him, including taking adverse employment actions by terminating Mr. Love's employment.

70.    At all times mentioned herein, Mr. Love's speech was on matters of widely debated public concern.

71.    By taking employment action against Mr. Love that was substantially motivated by the content of Mr. Love's constitutionally protected speech, Defendants violated Mr. Love's First Amendment rights.

72.    Defendants, acting under color of state law, terminated Mr. Love's employment with the state based on Mr. Love's Facebook posts in support of Mr. Rittenhouse's right to self-defense.

73.    Defendants were acting within the scope of their employment or agency with the State of Maryland when Defendants intentionally terminated Mr. Love in response to his private social media posts supporting Mr. Rittenhouse's right to self-defense.

74.     Defendants, in their act of terminating Mr. Love, engaged in unconstitutional viewpoint discrimination because their actions were substantially motivated by their disapproval of Mr. Love's political viewpoints in support of Mr. Rittenhouse's right to self-defense.

75.     As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Love suffered—and continues to suffer—significant damages including psychological and emotional harms, reputational harms, lost promotion opportunities and associated wages and pension income, and lost future income from post retirement private sector employment opportunities that will be unavailable to him.

76.     As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Love suffered—and continues to suffer—mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort.

77.     Defendants acted intentionally and with malice towards Mr. Love to deny his freedoms protected by the First Amendment when they terminated his employment.

WHEREFORE Plaintiff requests compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other costs as permitted by 42 U.S.C. § 1988.

## <u>COUNT II</u>

### Retaliation Based on Exercise of Right to Free Speech in Violation of 42 U.S.C. § 1985
### (All Defendants)

78.     Plaintiff incorporates paragraphs 1 to 77 as if fully set forth herein.

79.     Defendants managed, had authority over, and or were materially involved in the decision to terminate Mr. Love.

80.     On or about August 28, 2020 Mr. Love posted several comments in supports of Mr. Rittenhouse's right to self-defense in a private Facebook discussion, using his private device, in his private time, outside the scope of his official duties as a state employee.

81.     Mr. Love's Facebook posts at issue constitute constitutionally-protected activity commenting as a private citizen on matters of public concern on his personal social media account.

82.     As a result of Mr. Love's constitutionally protected activity he was subjected to adverse action by Defendants that would chill an ordinary person from continuing to engage in that protected activity.

83.     There was a substantial causal relationship between the constitutionally-protected activity and the adverse action taken by Defendants against Mr. Love.

84.     As a direct result of Mr. Love exercising his constitutional right to speak publicly, in his own time, as a private citizen, on a matter of public concern, Defendants retaliated against him, including taking adverse employment actions by terminating Mr. Love's employment.

85.     At all times mentioned herein, Mr. Love's speech was on matters of widely debated public concern.

86.     By taking employment action against Mr. Love that was substantially motivated by the content of Mr. Love's constitutionally protected speech, Defendants violated Mr. Love's First Amendment rights.

87.     Defendants, acting under color of state law, terminated Mr. Love's employment with the state based on Mr. Love's Facebook posts in support of Mr. Rittenhouse's right to self-defense.

88.     Defendants were acting within the scope of their employment or agency with the State of Maryland when Defendants intentionally terminated Mr. Love in response to his private social media posts supporting Mr. Rittenhouse's right to self-defense.

89.     Defendants, in their act of terminating Mr. Love, engaged in unconstitutional viewpoint discrimination because their actions were substantially motivated by their disapproval of Mr. Love's political viewpoints in support of Mr. Rittenhouse's right to self-defense.

90.     Defendants conspired to deprive Mr. Love of his rights protected by the First and Fourteenth Amendments to the United States Constitution.

91.     In furtherance of the aforesaid conspiracy, one or more of the Defendants committed an overt act, to wit, upon information and belief, one or more of the Defendants decided to, and did, fired Mr. Love because his speech was "inconsistent with the mission and core values of the Office of Community Initiatives."

92.     Further, Defendant McAdams' public statement that Mr. Love was relieved of his duties because his speech was "inconsistent with the mission and core values of the Office of Community Initiatives" constitutes an additional overt act of the unlawful conspiracy.

93.     The Defendants, in terminating Mr. Love's employment, engaged unconstitutional viewpoint discrimination because their actions were substantially motivated by their dislike of Mr. Love's viewpoints in support of Mr. Rittenhouse's right to self-defense.

94.     Defendants achieved the objective of their conspiracy. By terminating Mr. Love, the Defendants punished Mr. Love for participating as a private citizen in a public debate of great public concern. Defendants improperly curtailed Mr. Love's freedom of expression in violation of the First Amendment to the United States Constitution.

95.     As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Love suffered—and continues to suffer—significant damages, including psychological and emotional harms, reputational harms, lost promotion opportunities and associated wages and pension income, and lost future income from post-retirement private sector employment opportunities that will be unavailable to him.

96.     As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Love suffered—and continues to suffer—mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort.

97.     Defendants acted intentionally and with malice towards Mr. Love to deny his freedoms protected by the First Amendment when they terminated his employment.

WHEREFORE Plaintiff requests compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other costs as permitted by 42 U.S.C. § 1988.

## COUNT III

**Retaliation Based on Exercise of Right to Free Speech in
Violation of 42 U.S.C. § 1986
(All Defendants)**

98.     Plaintiff incorporates paragraphs 1 to 97 as if fully set forth herein.

99.     Defendants managed, had authority over, and or were materially involved in the decision to terminate Mr. Love.

100.    On or about August 28, 2020, Mr. Love posted several comments in supports of Mr. Rittenhouse's right to self-defense in a private Facebook discussion, using his private device, in his private time, outside the scope of his official duties as a state employee.

101.    Defendants conspired to deprive Mr. Love of his rights protected by the First and Fourteenth Amendments to the United States Constitution.

102.    In furtherance of the aforesaid conspiracy, one or more of the Defendants committed an overt act, to wit, upon information and belief, one or more of the Defendants decided to, and did, fired Mr. Love because his speech was "inconsistent with the mission and core values of the Office of Community Initiatives."

103.    Further, Defendant McAdams' public statement that Mr. Love was relieved of his duties because his speech was "inconsistent with the mission and core values of the Office of Community Initiatives" constitutes an additional overt act of the unlawful conspiracy.

104.    The Defendants, in terminating Mr. Love's employment, engaged unconstitutional viewpoint discrimination because their actions were substantially motivated by their disapproval of Mr. Love's viewpoints in support of Mr. Rittenhouse's right to self-defense.

105.    Defendants achieved the objective of their conspiracy. By terminating Mr. Love, the Defendants effectively punished Mr. Love for participating, in his capacity as a private citizen, in this public debate of great public concern. Defendants' actions improperly curtailed Mr. Love's freedom of expression in violation of the First Amendment to the United States Constitution.

106.    Defendants had knowledge that the wrongs conspired to be done in violation of Mr. Love's First and Fourteenth Amendment rights were about to be committed. Despite having power to prevent or aid in preventing the commission of the same, Defendants neglected or refused to do so.

    WHEREFORE Plaintiff requests compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other costs as permitted by 42 U.S.C. § 1988.

## COUNT IV

**Retaliation Based on Exercise of Article 40 Right to Freedom of Speech in Violation of the Maryland Tort Claims Act
(All Defendants)**

107.    Plaintiff incorporates paragraphs 1 to 106 as if fully set forth herein.

108.    Mr. Love's Facebook posts in support of Mr. Rittenhouse's right to self-defense were made using Mr. Love's personal device, outside the scope of his employment, on Mr. Love's private social media account.

109.    Mr. Love was participating, in his capacity as a private citizen, in a public conversation on a topic of national concern when he voiced his support of Mr. Rittenhouse's right to self-defense.

110.    Defendants, acting within the scope of their employment or agency with the State of Maryland, intentionally terminated Mr. Love's employment in response to his private social media posts supporting Mr. Rittenhouse's right to self-defense.

111.    Defendants' actions in terminating Mr. Love were substantially motivated by their disapproval of Mr. Love's viewpoints which supported Mr. Rittenhouse's right to self-defense.

112.    By terminating Mr. Love's employment, Defendants denied his freedoms protected by Article 40 of the Maryland Declarations of Rights.

113.    The State of Maryland is liable for the acts of Defendants on the theory of *respondent superior*.

WHEREFORE, Plaintiff demands compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other cost as permitted by law.

## COUNT V

**Wrongful Discharge Under Federal Law**
**(All Defendants)**

114.   Plaintiff incorporates paragraphs 1 to 113 as if fully set forth herein.

115.   Defendants wrongful discharged Mr. Love because:

      a.   An employment relationship existed between Mr. Love and the Maryland State Government.

      b.   Defendants intentionally, maliciously, or wrongfully terminated Mr. Love because Mr. Love exercised his federal right to freedom of speech enshrined in the First Amendment.

      c.   Defendants' conduct violated the public policy of the State of Maryland.

WHEREFORE, Plaintiff demands compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other cost as permitted by law.

## COUNT VI

**Wrongful Discharge Under State Law**
**(All Defendants)**

116.   Plaintiff incorporates paragraphs 1 to 115 as if fully set forth herein.

117.   Defendants wrongful discharged Mr. Love because:

      a.   An employment relationship existed between Mr. Love and the Maryland State Government.

      b.   Defendants intentionally, maliciously, or wrongfully terminated Mr. Love because of Mr. Love's speech on matters of public concern, in violation of Article 40 of the Maryland Declaration of Rights.

    c.   Defendants' conduct violated the public policy of the State of Maryland.

WHEREFORE, Plaintiff demands compensatory and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other cost as permitted by law.

## **PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendants as follows:

i.   An award of compensatory, special, and punitive damages in appropriate amounts to be established at trial;

ii.   An award of costs associated with this action; and

iii.   Any and all other or further relief that this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demands a trial by jury on all issues so triable.

August 11, 2021

Respectfully submitted,

/s/
Jeffrey E. McFadden (D. Md. Bar No. 08738)
Law Offices of Jeffrey E. McFadden, LLC
312 Prospect Bay Drive East
Grasonville, MD  29638
(410) 490-1163
jmcfadden@jmcfaddenlaw.com

John Pierce (*Pro Hac Vice Motion Pending*)
Pierce Bainbridge P.C.
355 S. Grand Avenue, 44th Floor
Los Angeles, CA  90071
(213) 262-9333
(213) 279-2008 (fax)
jpierce@piercebainbridge.com

*Attorneys for Plaintiff Arthur M. Love.*